IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| MAYOR & CITY COUNCIL OF BALTIMORE,<br><br>        Plaintiff,<br><br>v.<br><br>DAVE INC.,<br><br>        Defendant. | Case No: 1:26-cv-____<br><br>Removed from the Circuit Court for Baltimore City, Maryland<br>Case No. C-24-25-010691 |

## NOTICE OF REMOVAL

Defendant Dave Inc. ("Dave"), with reservation of all defenses and rights, hereby gives notice to this Court under 28 U.S.C. §§ 1331, 1332, 1441(a), and 1446 that it is removing the above-entitled action from the Circuit Court for Baltimore City, Maryland (the "State Court") to the United States District Court for the District of Maryland, Northern Division. In support of this Notice of Removal, Dave states as follows:

### BACKGROUND

1.      Dave is a fintech company that provides a mobile-first platform designed to improve the financial health of its users ("Members"), through which they can access various financial products and services. Among those services, Dave makes available on its platform demand deposit accounts provided by federally insured, state-chartered banks ("DDAs"). These DDAs are called ExtraCash, Dave Checking, and Dave Goals. Dave's bank partners are Federal Reserve member banks Evolve Bank & Trust, which is chartered in Arkansas, and Coastal Community Bank, which is chartered in Washington ("Partner Banks"). Dave Members can open an ExtraCash or Dave Checking account through the Dave app by passing the Partner

Banks' "Know Your Customer" standards and agreeing to the Partner Banks' ExtraCash Account Agreement and Checking Account Agreement.

2. Generally, Dave Checking accounts can be funded with direct deposit, an external debit card, an external bank account, remote deposit check capture, or ExtraCash. ExtraCash funds can be deposited or withdrawn electronically via automated clearing house ("ACH") transfers, intrabank book transfers, and debit card (push-to-debit) transactions. When electronically transferring funds out of ExtraCash accounts, Members are provided with the ability to transfer any amount of their own funds to Dave Checking or another bank account, as well as the option to transfer funds in excess of the available balance in certain amounts determined by the Partner Bank's credit policy. If a Member elects to transfer funds in excess of the available balance and the Partner Bank honors such a request, the account will overdraw, resulting in a negative balance. Dave Goals accounts are designed for setting up and tracking savings goals.

3. Currently, Members are assessed an overdraft fee for each overdraft in the amount of 5% of the transaction that caused the overdraft or $5, whichever is greater, subject to a $15 maximum. Members may transfer funds from their ExtraCash account internally to a Dave Checking account or to an external account via ACH for no fee. If a Member instead chooses to transfer funds externally using the debit card network, there is a fee of 1.5% of the amount transferred (whether an overdraft amount, the Member's own funds, or a combination). Prior to February 2025, in lieu of the overdraft fee, Members had the option to pay expedited funds transfer fees and/or tips, but whether they did so and in what amount had no impact on the agreement to pay or amount of overdraft paid by the Partner Banks.

4. Members can spend Dave Checking account funds using a Dave Checking virtual debit card, a physical Dave-branded Mastercard, or mobile wallets such as Apple Pay and Google Pay. Members can also make no-fee withdrawals at any of the approximately 40,000 MoneyPass ATM network locations throughout the United States. There is no minimum balance requirement.

5. Prior to approximately June 2022 (for new members) and May 2023 (for existing members), Dave offered an Earned Wage Access ("EWA") product, also called ExtraCash. While the historical EWA product and current overdraft product are materially distinct in their structure, operation, and pricing, the Complaint refers to ExtraCash interchangeably and erroneously as "an overdraft service or an earned wage advance." Complaint ¶ 3. Further, in an effort to erase this distinction, the Complaint conspicuously omits any reference to the Partner Banks.

6. Plaintiff, the Mayor & City Council of Baltimore, commenced this action against Dave in the Circuit Court for Baltimore City Maryland, Case No. C-24-25-010691. The Complaint attempts to state two claims for violations of Baltimore's Consumer Protection Ordinance ("CPO"). *Id.* ¶¶ 104-129. Plaintiff asserts that Dave "violated the CPO" by, among other things, allegedly "[mis]representing ExtraCash Advances as a non-loan product;" "failing to represent the material fact that ExtraCash Advances are loans, not overdraft services;" and "[mis]representing ExtraCash Advances as providing instant payment with zero interest." *Id.* ¶ 113. The Complaint seeks the maximum amount of statutory penalties available for each alleged violation of the CPO. The Complaint also seeks injunctive relief ordering, among other things, that ExtraCash is void and unenforceable and that Dave return all principal, fees, and tips to Baltimore consumers. *Id.* at Request for Relief. Dave denies Plaintiff's allegations.

**GROUNDS FOR REMOVAL**

7. There are two independent bases for removing this action to this Court. *First*, this case is subject to diversity jurisdiction because there is complete diversity between Dave (a resident of Delaware and California) and the Mayor & City Council of Baltimore (a resident of Maryland) and the amount in controversy exceeds $75,000.

8. *Second*, this case is subject to federal question jurisdiction because Plaintiff's Complaint necessarily raises disputed and substantial federal issues concerning the regulation of banks that this Court may address without disturbing the federal-state balance approved by Congress.

**I.     Removal Is Proper Based on Diversity Jurisdiction**

9. Diversity jurisdiction requires complete diversity of citizenship and an amount in controversy over $75,000. *See Gainer v. Lynn*, Civil No. 25-907-BAH, 2025 WL 1068052, at *2 (D. Md. Apr. 9, 2025). This Court has original jurisdiction over this matter under 28 U.S.C. § 1332 and 28 U.S.C. § 1441 because it involves a controversy that exceeds the amount of $75,000 and because Plaintiff and Defendant are citizens of different states.

10. There is "a strong federal interest in adjudicating cases brought under the congressional grant of diversity jurisdiction." *Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 563 (6th Cir. 2010). That "already strong federal interest" is even stronger when there are additional federal interests at play. *Id.*; *see also Mitcheson v. Harris*, 955 F.2d 235, 237 (4th Cir. 1992) ("In the ordinary diversity case . . . there are paramount federal interests in having federal courts resolve questions of state law and accord protection to out-of-state parties."); *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 725 (9th Cir. 2012) (holding that "California's Unfair Competition Law is preempted when applied in a manner that prevents or significantly interferes with a national bank's federally authorized power to choose a posting

order" that determined overdraft fees). Exercising the Court's diversity jurisdiction is particularly appropriate here given the strong federal interest in the uniform framework for interstate banking, as reflected in the statutes, regulations, bank regulatory guidance, and federal common law discussed below in Section II.

  **A.**  **Complete Diversity Exists**

  11.  To establish diversity jurisdiction, "no defendant may be a citizen of the same state as any plaintiff." *Pebbles v. Corporate Hollywood, et al.*, Case No. 25-cv-797-ABA, 2025 WL 1079533, at *1 (D. Md. Apr. 10, 2025).

  12.  For purposes of diversity jurisdiction, a corporation is "a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1).

  13.  Plaintiff is a municipal corporation organized under Maryland law. Complaint ¶ 10; Archives of Maryland, Session Laws Vol. 206, 256 (1796), https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000105/html/am105--256.html (last visited Jan. 10, 2026); Md. Const. Art. XI, § 9. Plaintiff is accordingly a citizen of Maryland.

  14.  Dave is a Delaware corporation headquartered in Los Angeles, California. Complaint ¶ 11. Dave is thus a citizen of Delaware and California. *See* 28 U.S.C. § 1332(c)(1).

  15.  Plaintiff and Defendant are, accordingly, citizens and residents of different states and complete diversity exists under 28 U.S.C. § 1332.

  **B.**  **The Amount in Controversy Exceeds $75,000**

  16.  Under 28 U.S.C. § 1332(a), diversity jurisdiction requires that the matter in controversy "exceed[] the sum or value of $75,000, exclusive of interest and costs." A notice of removal "need include only a plausible allegation that the amount in controversy exceeds the

jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). "Evidence establishing the amount" in controversy is not required to be included with the notice of removal, but instead is required only "when the plaintiff contests, or the court questions, the defendant's allegation." *Id.*

17. By Plaintiff's own estimate in the Case Information Sheet filed in the State Court, Plaintiff seeks more than $100,000 in monetary damages exclusive of attorneys' fees, interest, and court costs. *See* Ex. A at 2.

18. Moreover, Plaintiff's allegations in the Complaint establish that the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1446(c)(2)(A).

19. *First*, Plaintiff's request for statutory penalties easily exceeds the $75,000 amount in controversy threshold. The Complaint asserts that Plaintiff seeks the "maximum amount of statutory penalties available . . . for each violation of Baltimore's CPO." Complaint, Request for Relief. It also asserts that each alleged "misrepresentation and failure to disclose material facts," "[e]ach fee and tip," and "[e]ach day in which Dave [allegedly] has operated without a license" constitutes a "separate violation of the CPO." *Id.* ¶¶ 115-117, 126, 127.

20. Statutory damages can be aggregated to determine the amount in controversy for diversity jurisdiction. *See Bartnikowski v. NVR, Inc.*, 307 F. App'x 730, 735 (4th Cir. 2009) ("Statutory liquidated damages are properly includable in the calculation of the jurisdictional amount here[.]"); *Parker v. Goldman Sachs Mortg. Co. Ltd. P'ship*, 596 F. Supp. 3d 559, 566 (D. Md. 2022) (explaining that aggregated statutory penalties satisfy the amount in controversy requirement for removal purposes) (citing *Sayre v. Westlake Servs., LLC*, Civil Action No. ELH-15-687, 2015 WL 4716207, at *7 (D. Md. Aug. 7, 2015)); *Winner v. Kelco Fed. Credit Union*, Civil Action No. ADC-20-3420, 2021 WL 5882918, at *11 (D. Md. Dec. 9, 2021) (exercising

diversity jurisdiction and affirming that the statutory damages for defendant's alleged violations of various West Virginia state laws amounted to $76,000).

21. The CPO provides for civil penalties up to $1,000 per violation. CPO § 4-3(a). Each violation is a separate offense, and each day of each violation is considered a separate violation. CPO § 4-3(b)-(c).

22. Plaintiff asserts violations of the CPO that pre-date October 1, 2025, which was 90 days before the filing of the Complaint. *See, e.g.,* Complaint ¶ 5. Taking the allegations of the Complaint as true for purposes of this Notice of Removal only, Plaintiff plainly has asserted that Dave engaged in violations of the CPO for more than 75 days. Accordingly, under Plaintiff's theory of the case, the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1446(c)(2)(B).

23. *Second*, Plaintiff's request for injunctive relief exceeds the amount in controversy threshold. Plaintiff seeks injunctive relief ordering that all ExtraCash overdraft transactions are void and unenforceable, that Dave must "return all principal, fees, and tips to Baltimore consumers," and that it must "reform its practices" in an undefined manner. Complaint, Request for Relief.

24. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977); *see also* 28 U.S.C. § 1446(c)(2)(A)(i) (notice of removal may assert amount in controversy if "nonmonetary relief" is sought). "That value is measured from either the perspective of the plaintiff or the defendant." *Clark v. DocuSign, Inc.*, Civil Case No. 1:22-cv-02892-SAG, 2023 WL 2330698, at *2 (D. Md. Mar. 2, 2023); *see also Liberty Mut. Fire Ins. Co. v. Hayes*, 122 F.3d 1061 (Table), *3 (4th Cir.

7

1997) (determining the amount in controversy by considering "the potential pecuniary effect that a judgment would have on either party to the litigation"); *Stevens v. U.S. Bank Nat. Ass'n*, Civil Action No. DKC 15-1780, 2015 WL 5201578, at *2 (D. Md. Sept. 4, 2015) ("[T]he relevant inquiry is whether the 'direct pecuniary value' of the right the plaintiff seeks to enforce, or the cost to the defendant of complying with any prospective equitable relief exceeds $75,000.") (internal quotation marks and citations omitted).

25.     Taking the allegations of the Complaint as true for purposes of this Notice of Removal only, the value and object of the litigation—including the civil penalties and without even reaching the return of all principal, fees, and tips to every ExtraCash customer in Baltimore—exceeds $75,000.

26.     Though Plaintiff's Complaint fails to specify the amount of the money judgment it seeks, in violation of the Maryland Rules, this omission does not deprive this Court of jurisdiction.  Maryland Rule 2-305 requires that, "[u]nless otherwise required by law, . . . a demand for money judgment that does not exceed $75,000 shall include the amount of damages sought," while "a demand for a money judgment that exceeds $75,000 shall not specify the amount sought, but shall include a general statement that the amount sought exceeds $75,000." The Maryland Rules do not permit Plaintiff to "skirt federal jurisdiction" by omitting this statement, "while simultaneously leaving open a path to a larger recovery at trial." *Brennan v. Stevenson*, Civil Action No. JKB-15-2931, 2015 WL 7454109, at *2 (D. Md. Nov. 24, 2015).

27.     Without conceding any merit to the Complaint's allegations or causes of action, the amount in controversy satisfies the jurisdictional threshold.

**II.     Removal Is Proper Based on Federal Question Jurisdiction**

28.     Removal is also authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because this action necessarily raises disputed and substantial federal questions that a federal

forum may entertain without disturbing the congressionally approved balance of responsibilities between the federal and state judiciaries. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 315 (2005).

29. The original jurisdiction of the district courts includes "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Suits alleging state-law causes of action nevertheless "arise under" federal law if "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see also Grable*, 545 U.S. at 315. "Where all four of these requirements are met . . . jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Gunn*, 568 U.S. at 258 (quoting *Grable*, 545 U.S. at 313–14). Determining whether these factors are present "calls for a 'common-sense accommodation of judgment to [the] kaleidoscopic situations' that present a federal issue" and therefore "justify resort to . . . a federal forum." *Grable*, 545 U.S. at 312–13 (quoting *Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 117 (1936)) (alterations in original). This case satisfies all four requirements.

30. *First,* the Complaint raises a substantial question of federal law concerning the interplay of federal banking regulations. Although the Complaint asserts deceptive and unfair trade practices claims under the Baltimore CPO, these claims necessarily raise important issues of federal law governing DDAs with a discretionary overdraft feature (regulated by the Truth in Savings Act, 12 U.S.C. § 4301, *et seq.* ("TISA"), and the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.* ("EFTA")) and by seeking to regulate these products under the Truth in

Lending Act, ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, the primary federal law governing consumer credit.

31.  As set forth above, Dave Checking and ExtraCash accounts are DDAs with federally insured, Federal Reserve member banks chartered in states outside of Maryland. Federal and state law confer powers on these Partner Banks to engage in "all such incidental powers as shall be necessary to carry on the business of banking," including powers associated with deposit accounts. 12 U.S.C. § 24; 12 U.S.C. § 1831a; Ark. Code Ann. § 23-47-101(b); Wash. Rev. Code § 33.12.010.

32.  The Uniform Commercial Code defines a deposit account as any deposit or credit account with a bank, including "a demand, time, savings, passbook, or similar account maintained with a bank." UCC Art. 9 § 9-102(29); *see also Tilghman Hardware, Inc. v. Larrimore*, 331 Md 390, 396–98 (1993) (relying on UCC § 9-102). The Office of the Comptroller of the Currency ("OCC") defines demand accounts to mean "non-interest-bearing demand deposits that are subject to check *or to withdrawal or transfer* on negotiable or transferable order to the savings association and that are permitted to be issued by statute, regulation, or otherwise and are payable on demand." 12 C.F.R. § 161.16 (emphasis added).

33.  Bank regulators view overdraft services to be a form of credit. *See generally* OCC, Comptroller's Handbook – Deposit-Related Credit (2020) (classifying overdraft programs, including "automated overdraft protection, bounced check protection, and courtesy overdraft protection" as forms of "deposit-related credit"); OCC, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, National Credit Union Administration, Joint Guidance on Overdraft Protection Programs, 70 Fed. Reg. 9127, 9129 (Feb. 24, 2005). TILA defines "credit" to mean "the right granted by a creditor to a debtor to defer payment of

debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). A "creditor," in turn, is someone who extends "consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required." *Id.* at § 1602(g).

34. The term finance charge includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). Regulation Z, 12 C.F.R. § 1026.1 *et seq.*, which implements TILA, excludes certain types of charges even if they would otherwise meet the definition of a finance charge, including charges that are the same across credit and non-credit transactions and charges for discretionary overdraft services. *Id.* at cmt. 4(a)-1(iii); § 1026.4(c)(3). Overdraft services are not credit subject to TILA because they are not payable in installments and the associated charges are excluded from the definition of a finance charge.

35. Instead, they are covered by Regulation E, which is the federal regulation implementing EFTA. *See* Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,055 (Nov. 17, 2009). Regulation E defines overdraft as "a service under which a financial institution assesses a fee or charge on a consumer's account held by the institution for paying a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account." 12 C.F.R. § 1005.17(a).

36. Overdraft services are also regulated by TISA, which governs disclosures relating to deposit accounts. It requires a "clear and uniform disclosure" of fees assessed against deposit accounts. 12 U.S.C. § 4301(b). TISA's implementing regulation, Regulation DD, prescribes specific fee disclosure requirements for overdraft services. *See* 12 C.F.R. § 1030.11.

37. In addition, overdraft has been the subject of a rule issued by the Consumer Financial Protection Bureau ("CFPB"), overturned by Congress, and later withdrawn by the CFPB itself. *See* 89 Fed. Reg. 106768 (Dec. 30, 2024), Pub. L. No. 119-10 (March 27, 2025); 90 Fed. Reg. 20084 (May 12, 2025).

38. Federal courts and bank regulators have long recognized that creating and recovering overdrafts are aspects of deposit account services. *See* OCC Interpretive Letter No. 1082, 2007 WL 5393636 (May 17, 2007) ("Where a customer creates debits on his or her account for amounts in excess of the funds available in that account," a bank's election to "honor overdrafts and recover the overdraft amount" is "part of or incidental to the business of receiving deposits."); *see also Fawcett v. Citizens Bank, N.A.*, 919 F.3d 133, 138 (1st Cir. 2019) ("OCC's interpretation in Interpretive Letter 1082 is 'consistent with the regulatory text' and not plainly erroneous."); *Johnson v. BOKF Natl. Assn.*, 15 F.4th 356, 363 (5th Cir. 2021) ("We conclude that OCC's determination in Interpretive Letter 1082 that 'Continuous Overdraft Fees' are classified as deposit account services . . . is reasonable [and] consonant with the majority view on the subject based on the public comment submissions."); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, Civil Action No. CV 6:15-MN-2613-BHH, 2018 WL 1101360, *7 (D.S.C. Feb. 28, 2018) ("[T]here is ample evidence to suggest that the most pertinent regulator, the OCC, considers 'overdraft fees' to be deposit account service charges, *not* interest."); *Terrell v. Hancock Bank*, 7 F. Supp. 2d 812, 816 (S.D. Miss. 1998) (concluding that overdraft fees are not interest because they "arise[ ] from the terms of the Depository Agreement").

39. Arkansas and Washington have state laws expressly permitting overdraft charges or fees. *See* Ark. Code Ann. § 4-4-401; Wash. Rev. Code § 62A.4-4-1.

40. In conflict with these statutes, regulations, and federal common law, Plaintiff's Complaint asserts that overdraft fees constitute impermissible finance charges that, when improperly expressed as annual percentage rates, exceed the maximum 33% rate of interest allowable under Maryland law. Complaint ¶¶ 2, 55.

41. EWA products separately implicate federal law. Indeed, one week before Plaintiff filed the Complaint, the CFPB issued an Advisory Opinion ("AO") concluding that debt is "a financial liability or obligation owed by one person, the debtor, to another, the creditor." *See* Truth in Lending (Regulation Z); Nonapplication to Earned Wage Access Products, 90 Fed. Reg. 60069, 60071 (Dec. 23, 2025) ("AO"). The AO further concludes that EWA is not credit because it "involves 'no independent obligation to repay,'" and the provider "has no claim direct or indirect against a worker for nonpayment in the event of a failed or partial deduction. 90 Fed. Reg. at 60072. It also concludes that optional "expedited delivery fees and tips associated with EWA," which the Complaint alleges constitute interest, *see* Complaint ¶ 55, "are not finance charges." *Id.* at 60074 (capitalization omitted). Specifically, optional express fees and tips are not finance charges "since consumers can receive exactly the same service without paying the fee." *Id.* at 60075.

42. *Second*, a federal question is actually disputed because Plaintiff's made-for-litigation theories require overwriting the federal banking laws and regulations discussed above. For example, Plaintiff asserts that "bona fide" or "genuine overdraft services" require a "payment to a third party" that spares a consumer "embarrassment caused by a declined transaction." Complaint ¶¶ 45, 46, 61. But there is no requirement in Regulation E or in any other banking regulation (federal, Arkansas, or Washington state) that, in order to be real, an

overdraft transaction must be initiated by a third party or cause embarrassment if not honored. Nor is there any such requirement in the CPO itself, as Plaintiff implies.

43. Plaintiff also asserts that ExtraCash accounts lack "the essential functions of a consumer bank account," which Plaintiff defines as "checks, an ATM card, debit card, or automatic bill payment." Complaint ¶ 42. Again, however, federal and state banking laws and regulations do not require that DDAs have such functions in order to be real, and neither does the CPO. In any event, such "essential functions" are available through a Dave Checking account.

44. Accordingly, Plaintiff's position is inconsistent with TILA, TISA, Regulation Z, Regulation DD, the UCC, the laws of the states that licensed the Partner Banks, and decades of federal common law, and would undermine longstanding federal regulatory guidance if the requirements Plaintiff has devised for purposes of a litigation strategy are written into the CPO.

45. *Third*, this disputed federal question is substantial because Plaintiff's attempt to impose liability for alleged conduct that is authorized by federal law would disrupt the strong federal interest in the uniform regulation of interstate banking.

46. Uniquely federal interests exist where "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). That is the case with powers incidental to the business of banking and receiving deposits.

47. Congress enacted the National Bank Act over 150 years ago, "intend[ing] to facilitate . . . a 'national banking system.'" *Marquette Nat'l Bank of Minneapolis* v. *First of Omaha Serv. Corp.,* 439 U.S. 299, 314-15 (1978) (quoting Cong. Globe, 38th Cong., 1st Sess., 1451 (1864)). Congress enacted Section 27 of the federal Depository Institution Deregulation and Monetary Control Act to provide parity and "[i]n order to prevent discrimination against

State-chartered insured depository institutions." 12 U.S.C. § 1831d(a).  While there is not complete preemption of state law for non-interest fees and charges (like overdraft fees and charges), federal common law governs in areas in which there are "uniquely federal interests" such that application of state law would be inappropriate.  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-07 (1988).

48. Although Plaintiff's Complaint avoids any direct reference to the Partner Banks, it uses the word "overdraft" 73 times in 33 pages.  And Plaintiff does not once disavow any claims it would have under federal law against the Partner Banks if its theories of what constitutes a DDA and what constitutes an overdraft under the CPO were to prevail.  Accordingly, a federal court is best positioned to adjudicate this dispute.  *Cf. City of New York v. Chevron Corp.*, 993 F.3d 81, 92 (2d Cir. 2021) ("Because [the complaint] 'implicat[es] the conflicting rights of [s]tates [and] our relations with foreign nations,' this case poses the quintessential example of when federal common law is most needed.") (quoting *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981)).  Indeed, Plaintiff's theory would vary requirements imposed on DDAs by the city—and not just the state—in which a customer resides.

49. *Fourth*, removal would not disturb the "congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.  Courts assume that "Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Barnett Bank of Marian City, N.A. v. Nelson*, 517 U.S. 25, 33 (1996) (holding that state statute could not bar small town national banks from selling insurance where federal statute gave the banks such authority).

50. Federal law establishes a comprehensive regulatory framework governing the operation of consumer deposit accounts, overdraft practices, and related disclosures.  Yet

Plaintiff seeks to impose a novel theory of liability that would effectively dictate how banks chartered in Arkansas and Washington structure and administer their DDAs and overdraft-related products. Accordingly, resolving these federal issues in a federal forum reinforces—rather than disrupts—the balance Congress established between federal and state judicial responsibilities.

51. By contrast, this case does not present a difficult or substantial question of state or local law. The CPO itself is straightforward and mirrors in all respects—except for the massive civil penalty authority Plaintiff conferred upon itself in City Council Bill 23-0424, which Mayor Brandon Scott signed into law on October 11, 2023—a 50-year-old and oft-interpreted state statute with a clear and well-developed body of law. *See Consumer Prot. Div. Off. of Atty. Gen. v. Consumer Pub. Co.*, 501 A.2d 48 (Md. 1985) (discussing history of Maryland Consumer Protection Act's enactment). The only novelty in the case is Plaintiff's litigation strategy. In addition, "municipalities, unlike states, are not themselves sovereign and are not entitled to the same federal deference that the states receive." *Cleveland Hous. Renewal Project*, 621 F.3d at 566. In comparison to the strong federal interests discussed above, the state or local interest in adjudicating this dispute is minimal and there is no reason why this Court cannot do so.

52. To the extent that any part of Plaintiff's cause of action can be construed as non-federal, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over such claims because they form part of the same case or controversy as those causes of action over which the Court has original jurisdiction.

**PROPRIETY OF VENUE**

53. Venue is proper in the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). The State Court Action is being removed from the Circuit Court for Baltimore City, Maryland. The Circuit Court for Baltimore City, Maryland is

located within this District, and cases arising in the Circuit Court for Baltimore City, Maryland are properly assigned to the Northern Division of this Court. 28 U.S.C. § 100(1); 28 U.S.C. § 1441(a).

## TIMELINESS OF REMOVAL

54. Plaintiff served the Summons and Complaint on Dave on December 31, 2025. A true and correct copy of the Proof of Service is attached to this Notice as Exhibit E.

55. In accordance with 28 U.S.C. § 1446(b), this Notice of Removal is timely filed within 30 days of service. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-57 (1999) (30-day removal period begins to run upon service of summons and complaint).

## COMPLIANCE WITH 28 U.S.C. § 1446

56. Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served upon Defendant in this action, along with the State Court docket sheet, are attached to this Notice as Exhibit A (Case Information Sheet), Exhibit B (Complaint), Exhibit C (Summons to Dave), and Exhibit D (State Court Action Docket Sheet).

57. Defendant will file the Notice to Clerk with the Clerk of the Circuit Court for Baltimore City contemporaneously with this filing pursuant to 28 U.S.C. § 1446(d).

## RESERVATION OF RIGHTS AND DEFENSES

58. By filing this Notice of Removal, Defendant does not waive any defenses that may be available and reserves all such defenses. Defendant does not concede that Plaintiff states any claim upon which relief can be granted, or that Plaintiff is entitled to any relief of any nature.

59. If any challenges to the propriety of the removal of this action arise, Defendant respectfully requests the opportunity to present oral argument and/or additional evidence.

WHEREFORE, for the foregoing reasons, Defendant Dave Inc. respectfully requests that this action be, and is hereby, removed to this Court; this Court assume jurisdiction of this action; and this Court enter such other orders as may be necessary to accomplish the requested removal and promote the ends of justice.

Dated: January 29, 2026

Respectfully submitted,

<u>/s/  Kevin B. Collins</u>
Kevin B. Collins (D. Md. Bar No. 13131)
Valerie Hletko*
Jehan Patterson*
Connor Kelley*
Carter McCants*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel.: (202) 662-5598
kcollins@cov.com
vhletko@cov.com
jpatterson@cov.com
ckelley@cov.com
cmccants@cov.com

Jordan Joachim*
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
Tel.: (212) 841-1000
jjoachim@cov.com

*Counsel for Defendant Dave Inc.*

**pro hac vice* motions forthcoming

## **CERTIFICATE OF SERVICE**

I certify that, on January 29, 2026, I electronically filed the foregoing document (including exhibits) via CM/ECF, and that the foregoing document was served upon the following persons via email:

>Ebony M. Thompson, City Solicitor
>Sara Gross, Chief Solicitor
>Christopher Sousa, Chief Solicitor
>Zachary Babo, Assistant Solicitor
>Natalie Neill, Assistant Solicitor
>BALTIMORE CITY DEPARTMENT OF LAW
>100 N. Holliday Street
>Baltimore, MD 21202
>Ebony.Thompson@baltimorecity.gov
>Sara.Gross@baltimorecity.gov
>Christopher.Sousa@baltimorecity.gov
>Zachary.Babo@baltimorecity.gov
>Natalie.Neill@baltimoercity.gov
>
>John G. Albanese
>BERGER MONTAGUE PC
>1229 Tyler Street, NE, Suite 205
>Minneapolis, MN 55413
>jalbanese@bergermontague.com
>
>James Hannaway
>BERGER MONTAGUE PC
>1001 G Street, NW, Suite 400 East
>Washington, DC 20001
>jhannaway@bergermontague.com
>
>*Counsel for Plaintiff Mayor & City Council of Baltimore*

/s/ *Kevin B. Collins*
Kevin B. Collins (No. 13131)