# Exhibit B

E-FILED; Baltimore City Circuit Court
Docket: 12/30/2025 10:02 AM; Submission: 12/30/2025 10:02 AM
Envelope: 24429803

# IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | |
|---|---|
| MAYOR & CITY COUNCIL OF BALTIMORE,<br>100 N. Holliday Street<br>Baltimore, Maryland 21202,<br><br>  Plaintiff,<br><br>  v.<br><br>DAVE, INC.,<br><br>  Serve On:<br>  Registered Agent<br>  Telos Legal Corp.<br>  1818 11th Street, Suite 101<br>  Sacramento, California<br><br>  Defendant. | Case No. C-24-CV-25-010691<br><br>JURY TRIAL DEMANDED |

## MAYOR & CITY COUNCIL OF BALTIMORE'S COMPLAINT FOR CIVIL PENALTIES & INJUNCTIVE RELIEF

Plaintiff the Mayor and City Council of Baltimore, by and through its undersigned attorneys, ("Plaintiff," "Baltimore City," or "City") alleges as follows:

## INTRODUCTION

1.      Dave, Inc. ("Dave," "Defendant," or "the Company") makes high-frequency, small-amount, high-cost, short-term loans ("ExtraCash Advances") to consumers to be repaid from a consumer's next paycheck. There is a name for this kind of loan: a payday loan. Through deceptive marketing and unfair tactics, Dave leads consumers to believe that ExtraCash Advances are not loans, let alone high-interest loans. But they are. And just like other payday loans, Dave traps consumers in a cycle of debt as one ExtraCash Advance often leads to another.

2.      Dave has tried to avoid lending laws in different ways over the years. Dave's current scheme is to claim that it offers an overdraft service, but it is instead a loan. If a consumer wants a $40 ExtraCash Advance, the consumer must link a debit account to a Dave account, typically on a smartphone. If the consumer meets Dave's lending criteria, Dave charges a series of fees. First, Dave charges a recently implemented, mandatory "overdraft fee" for every loan. This amount is set at 5% of the principal, with a minimum of $5 and a maximum of $15 for every transaction. Second, Dave charges an express fee, a fee that Dave fails to meaningfully disclose despite advertising instantaneous access to funds. Third, to access an ExtraCash Advance, consumers must pay a monthly membership fee. Lastly, until this year, Dave manipulated and deceived consumers into providing "tips." Dave then charges these fees and the loan principal to the consumer's debit account on the date Dave determines will be the consumer's next payday, which can be anywhere between one and fourteen days from the day the loan is taken out. These fees add up to astounding, usurious annual percentage rates (APRs). Today, if a consumer takes out a $40 cash advance with repayment within three days, an

"overdraft fee" of $5, an express processing fee of $0.60, and a membership fee of $3, Dave will have charged a shocking usurious rate of over 2,500% APR for this transaction. Dave's APRs are routinely tens or hundreds of times higher than the maximum 33% interest rate allowed for consumer loans under Maryland law.

3.      Dave has alternatively referred to its ExtraCash Advance product as an overdraft service or an earned wage advance (EWA) in its marketing. But no matter the label a lender puts on their product, courts in Maryland protect consumers from these loans: "It matters not in what part of the transaction it may lurk, or what form it may take--whether it reads six per cent. upon its face, with an understanding to pay an extra four per cent., or whether it be a pretended sale and lease, or under whatever guise the lender--always fruitful in expedients--may attempt to evade the law, Courts of justice, disregarding the shadows and looking to the substance, will ascertain what in truth was the contract between the parties." *Andrews v. Poe*, 30 Md. 485, 488 (1869).

4.      Despite Dave's various machinations and labels, ExtraCash Advances are loans. Just like every other lender, Dave underwrites ExtraCash Advances to ensure repayment, provides funds, charges interest, and collects repayment nearly 100% of the time.

5.      As a lender to consumers in Maryland, Dave was required to obtain a license, either as a consumer lender or, as of October 1, 2025, as an EWA provider. If Dave registered and qualified as a licensed EWA provider, Dave would not be subject to some requirements under the Maryland Consumer Loan Law ("MCLL"). However, Dave is not licensed as either a consumer lender or an EWA provider, nor is the City aware of any effort by Dave to become licensed. Dave is thus an unlicensed consumer lender, attempting to operate in the shadows while charging more interest than the interest allowed under the MCLL.

6.      In its marketing to consumers, Dave contrasts itself to other lenders by promising the ability to get up to $500 instantly with no interest through ExtraCash Advances. Dave also—for a time—led consumers to believe that a tip would provide a set number of meals to children in need. But these claims fall apart when consumers actually seek an ExtraCash Advance.

7.      Contrary to Dave's representations, a consumer *must* pay interest to access instant funds. Consumers end up paying high APRs for ExtraCash Advances, a fact that Dave hides in its marketing and in the screens by which consumers navigate these transactions. These fees frequently exceed the interest rates offered by payday and other high-cost lenders. Making matters worse, Dave engineers ways to rack up as much interest as possible, including by misrepresenting the amount an ExtraCash user can obtain in a single transaction and, until recently, repeatedly pressuring customers to provide "tips." These tips also did not actually provide, as Dave said they would, a set number of meals to children.

8.      The result is consumers who are trapped in a cycle of debt. As a consumer obtains ExtraCash Advances—one after another—their available funds for utility bills, rent, and food go down. As a consumer's funds for utility bills, rent, and food dissipate, a consumer needs more ExtraCash Advances, and the cycle begins anew.

9.      Baltimore City law is clear: it is illegal for lenders like Dave to use unfair or deceptive trade practices. Dave hooks consumers into a cycle of debt through a combination of usurious loans and misrepresentations. Its actions are unfair and deceptive, and are contrary to public policy encapsulated by the MCLL. Through this action pursuant to the City of Baltimore's Consumer Protection Ordinance, the City seeks to put an end to these practices and protect Baltimore consumers.

## PARTIES

10.     Plaintiff Mayor & City Council of Baltimore is a municipal corporation organized and existing under the laws of Maryland. Plaintiff is authorized, through the City Solicitor of the Baltimore City Law Department, to enforce laws for the protection of the public. Baltimore City Charter Art. 7, §§ 22–24.

11.     Defendant Dave, Inc. is a Delaware corporation with its principal place of business at 1265 South Cochran Ave, Los Angeles, California 90019.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction because the claims at issue arise under an ordinance enacted in the City of Baltimore. Md. Code Ann., Cts. & Jud. Proc. § 1-501 ("The circuit courts are the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil . . . cases within its county[.]"). The amount-in-controversy exceeds the threshold for this Court to exercise exclusive jurisdiction. *Id.* §§ 1-501; 4-401(a).

13.     This Court may exercise personal jurisdiction over Dave because the City's claims arise from or are related to Dave's continuous (1) directed advertising to Maryland consumers through text, video, and image-based online advertisements, (2) directed marketing to Maryland consumers, (3) contracting with Maryland consumers to provide ExtraCash Advances, (4) extending loans to consumers, and (5) collecting debts from Maryland consumers. Dave intended, knew, or is chargeable with the knowledge, that its out-of-state actions would have a consequence within Maryland. *Id.* § 6-103.

14.     Venue is proper in this Court because a substantial part of the acts or omissions giving rise to the claims occurred in the City of Baltimore. *Id.* § 6-201 ("[A] civil action shall be brought in a county where the defendant . . . carries on a regular business[.]").

## FACTUAL ALLEGATIONS

15.     In marketing ExtraCash to consumers, Dave contrasts itself to payday lenders: "It's not a payday loan or a payday advance, but it is a way to get money when you need it."[1] Payday lenders charge high fees, some of which end up "resulting in a jaw-dropping APR of about 400%." Compounding these problems for consumers, many payday loans are renewed within weeks, which "could trap borrowers in a cycle of debt." By contrast, according to Dave, consumers who seek ExtraCash Advances "could qualify for up to $500 in 5 min or less" with "no credit check, interest, or late fees."

16.     Dave, in fact, offers the same payday loan features that it criticizes in its marketing to consumers. A recent Center for Responsible Lending study of five direct-to-consumer cash advance apps, including Dave, found that the average APR for loans is 383% for loans repaid within seven to fourteen days, in contrast to the 391% APR offered by a typical storefront payday lender.[2] For loans with shorter repayment schedules, ExtraCash APRs routinely exceed 1,000%.

17.     Data analyzed by the Center for Responsible Lending shows that, for Dave and four other direct-to-consumer apps, "repeat borrowing is the norm, not the exception: nearly

---

[1]     Dave, *The hidden costs of payday loans*, available at https://dave.com/blog/why-you-deserve-better-than-payday-advance-apps (last accessed November 17, 2025).

[2] Center for Responsible Lending, *Escalating Debt: The Real Impact of Payday Loan Apps Sold as Earned Wage Advances (EWA)* (Sept. 22, 2025), available at https://www.responsiblelending.org/research-publication/escalating-debt-real-impact-payday-loan-apps-sold-earned-wage-advances-ewa.

three-quarters of users (72%) not only come back for another loan, but do so quickly, taking out more than one loan within a two-week period."[3]

18.     These users are in a particularly precarious financial position because repayment typically happens on payday and Dave ensures, through its requirement that a consumer link their account with a debit card, that it cuts to the front of the line, ahead of a consumer's landlord, utility company, and any other creditors whose payments are also typically due on a payday. This problem compounds with increased usage. According to data analyzed by the Center for Responsible Lending, overdraft activity increases with more loans.[4] Users experiencing at least one overdraft rose from 9.7% before their first loan to 14.1% in the three months after taking out their first loan. Frequent users pay more than three times in overdraft fees alone, compared to less-frequent users.

19.     Dave has enticed Baltimore consumers by representing that ExtraCash Advances are not loans, are available instantly with no interest, and are available for up to $500 at a time. In fact, consumers have almost never been able to access $500 at a time, ExtraCash Advances have every fundamental feature of loans, and high APRs are mandatory to obtain an ExtraCash Advance. Dave has further misled consumers by repeatedly and deceptively pushing consumers to provide "tips," adding even more usurious interest. Through its deceptive and predatory tactics, Dave traps consumers in a cycle of debt.

**A. To Conceal the Fact that ExtraCash Advances Are Payday Loans, Dave Now Markets ExtraCash Advances as Overdraft Services and Charges "Overdraft Fees."**

20.     Today, Dave markets ExtraCash Advances as overdraft services, in an effort to contrast itself favorably to banks who charge exorbitant overdraft fees and payday lenders who charge usurious interest. While this marketing leads consumers to believe that ExtraCash

---

[3] *Id.*
[4] *Id.*

Advances are not loans, Dave's practices and internal treatment of ExtraCash Advances show the opposite.

>     i. *ExtraCash Advances Are Loans.*

21.    Dave has, at different points, marketed ExtraCash Advances as earned wage advances (EWAs) or overdraft services, asserting that the Company is merely offering a consumer early access to their wages or a one-time payment to make up for insufficient funds.

22.    When Dave started, it characterized itself as an EWA provider. But after regulators and consumer groups recognized that EWA providers are payday lenders by another name, Dave put a new label on ExtraCash: overdraft services. This marketing leads consumers to believe that Dave provides overdraft protections instead of what they actually receive: high-APR loans. No matter the label, ExtraCash Advances have every fundamental characteristic of a loan.

23.    Like other lenders, Dave uses underwriting procedures to ensure repayment. Dave makes ExtraCash available to consumers who are over 18 years old, with U.S. or military addresses, and have a Social Security number or tax ID. These advances must be for individual use for personal, family, or household purposes. Further, Dave collects demographic information about consumers seeking ExtraCash Advances.

24.    Dave requires users to connect their Dave accounts with an external debit account and pre-authorize Dave to collect fees and repayment of a loan's principal through that debit account. Dave then uses a third-party service, Plaid, to verify a user's income and employment history as revealed in their external debit account.

25.    Like other lenders, Dave sets and adjusts acceptable credit risk levels to prioritize repayment rates or loan volume. Dave uses "CashAI," an underwriting model to "optimize credit

outcomes," model risk for a given loan, and ensure "lower delinquency and loss rates."[5] CashAI considers the information above and Dave's historic lending data to determine whether and for how much a loan will be issued.

26.    To ensure that a loan is repaid, Dave additionally requires that a user's external bank account have a positive balance and that Dave can detect at least three recurring payments totaling $1,000 or more.

27.    If Dave, after analyzing a user's spending history and other information, determines that the Company will be unable to obtain repayment, it will not issue an ExtraCash Advance.

28.    Dave further ensures repayment by restricting its larger loan amounts to remarkably few users. According to internal documents obtained by the Federal Trade Commission and U.S. Department of Justice, only 1 in 10,000 (0.009%) of new users are offered the $500 loan advertised in nearly every Dave advertisement and social media post. And less than 1% of loan offers are for $250 or more.

29.    By extending credit only to those who can repay and approving amounts that can be repaid, Dave underwrites its loans in a way that is materially indistinguishable from that of a traditional lender.

30.    Dave also engages in aggressive collections like other lenders, leading to a nearly 100% collections rate. In the third quarter ended September 30, 2025, for example, the Company

---

[5]    Dave, *Dave Introduces CashAI v5.5* (Sept. 10, 2025), available at https://web.archive.org/web/20250917192449/https://investors.dave.com/news-releases/news-release-details/dave-introduces-cashai-v55.

reported a 28-day delinquency rate of 2.33%, meaning that Dave obtained repayment within 28 days nearly 98% of the time.[6]

31.    Dave uses several hardball tactics to collect its debts.

32.    ExtraCash Advance amounts are "payable immediately upon demand, whether the negative balance was caused by your use of the Advance feature or otherwise."[7]

33.    As noted above, Dave requires a consumer's authorization to debit the consumer's bank account before it provides an ExtraCash Advance. Dave's automated collections process is set after a user provides sufficient information for Dave to detect at least three recurring deposits. Consumers agree to repay the ExtraCash Advance through pre-authorized withdrawals on payday. Dave estimates paydays based on when it expects a recurring deposit.

34.    After Dave takes note of the timing and amount of these recurring payments, Dave has the ability to jump the line to access a consumer's pay, debiting the consumer for amounts owed, which includes both the principal along with tips and fees. This way, Dave can ensure that it will get paid ahead of any utility company, landlord, or anyone else to whom the consumer owes money.

35.    If a consumer does not have enough funds to repay Dave its amount loaned, fees, and tips, Dave tries again and again to get its money. Dave will first attempt an ACH transfer, then attempt to access funds in any other Dave-affiliated account like a Dave Checking account. If these efforts fail, Dave will monitor the users' accounts to detect funds and charge those accounts to recoup any outstanding payments.

---

[6] Dave, *Dave Reports Third Quarter 2025 Financial Results* (Nov. 4, 2025), available at https://investors.dave.com/news-releases/news-release-details/dave-reports-third-quarter-2025-financial-r esults.
[7] Dave, *Dave ExtraCash Account Deposit Agreement and Disclosures*, https://dave.com/extra-cash ("Agreement").

36.     Until Dave gets its money, there is nothing a consumer can do to reverse the transaction. Dave forbids the revocation of any ExtraCash Advance.[8]

37.     Dave further asserts the "the right to set-off any liability, direct or contingent, past, present, or future, that you owe against any account you have with us" and Dave can "exercise our security interest or right of set-off without regard to the source of the funds in your ExtraCash Account or prior recourse to other sources of repayment or collateral, even if it causes you to incur penalties or suffer any other consequence."[9]

38.     In sum, ExtraCash Advances are loans. Dave uses an involved underwriting process to determine a consumer's eligibility and the amount of the loan for which they are approved. The consumer provides access to their bank account for repayment, which is debited automatically. Dave expects, and nearly always gets, repayment. The reality is that, contrary to Dave's representations, ExtraCash Advances are not merely earned wage advances or overdraft services. ExtraCash Advances are loans.

*ii. Dave Markets ExtraCash Advances as Overdraft Services and Charges "Overdraft Fees" Despite No Relation to Actual Overdraft Services.*

39.     Dave currently characterizes its product as an overdraft service. Its website notes that an ExtraCash account "offers an overdraft service that allows you to get money, if eligible."[10] Dave also charges a mandatory "overdraft fee" for this service which is calculated as $5 per ExtraCash Advance or 5%, whichever is greater up to a maximum of $15. Every Dave advertisement and social media post in recent months further characterize ExtraCash Advances as "overdrafts."

---

[8]     Dave, Knowledge base, ExtraCash, *ExtraCash settlement*, https://support.dave.com/hc/en-us/articles/37270256309389-Can-I-revoke-my-ExtraCash-payment-authorization (noting that ExtraCash Advances are "not eligible for cancellation").
[9] *See* Agreement.
[10] Dave, About ExtraCash, https://dave.com/about-extra-cash (last visited Dec. 29, 2025).

40.     ExtraCash Advances, however, bear no resemblance to actual overdraft services, and ExtraCash accounts bear no resemblance to functional consumer bank accounts.  In fact, both the "overdraft" and the "account" are a fiction.

41.     The process works as follows:  Dave tells a consumer that they have been approved for a cash advance.  Dave represents that the advance originates from an ExtraCash account, which is created for the consumer with a zero balance.  The consumer selects the amount of the advance, agrees to an "overdraft fee," and agrees that the advance amount, plus fees and charges, will be repaid from the consumer's linked bank account. When Dave transfers the advance to the consumer, Dave maintains this creates an "overdraft" in the consumer's ExtraCash account.

42.     Although Dave represents that an ExtraCash account "is intended to allow you to establish a cash reserve to help you cover emergencies and other unexpected expenses," it is not designed for accumulating or spending money.[11] In contrast to a typical checking account, an ExtraCash account has no option for checks, an ATM card, debit card, or automatic bill payment. It provides none of the essential functions of a consumer bank account. The amount in the account is either $0 (before an advance) or negative (after an advance). Contrary to Dave's representation, an ExtraCash account is solely a vehicle for debt, not savings.

43.     Below is what a consumer sees before and after obtaining a $40 ExtraCash Advance, complete with a $5 overdraft fee and express fee:

**Before**                                                          **After**

---

[11] Dave, ExtraCash, https://dave.com/extra-cash (last visited Dec. 29, 2025).

| ExtraCash and account balance | | ExtraCash and account balance | |
|---|---|---|---|
| ExtraCash available now | $40.00 | ExtraCash available | $35.00 |
| ExtraCash account balance | $0.00 | ExtraCash account balance | -$45.60 |

44.    According to Dave, this ExtraCash account has incurred a negative balance and the ExtraCash Advance is merely overdraft protection for this negative balance. But Dave itself created the negative balance by advancing the consumer cash in exchange for fees and the promise of repayment. The ExtraCash account simply functions as Dave's internal repayment ledger for managing this loan. The "overdraft" protection was never intended to protect consumers, and the ExtraCash account was never intended to encourage savings. Instead, Dave's ExtraCash account and its "overdraft" service are exactly the opposite: a vehicle for predatory loans that trap consumers in a cycle of debt.

45.    By contrast, genuine overdraft services protect against the inconvenience and embarrassment caused by a declined transaction with a third party. When a consumer writes a check, withdraws money from an ATM, uses a debit card to make a purchase, or makes an automatic bill payment, with insufficient funds, a bank has the discretion to charge an overdraft fee. For example, a consumer may attempt to pay for $50 of groceries with $40 in their debit account. The consumer's bank can pay the grocery store and charge a fee to the consumer.

46.    Unlike actual overdraft services, ExtraCash Advances do not on their own terms cover payment to a third party to avoid a declined transaction.

47.    Unlike actual overdraft services, ExtraCash Advances can include an express fee for expedited delivery of funds. It makes sense to allow for different disbursement timelines for

loans because loans are intended to cover future expenses and a consumer may want to pay for those forward-looking expenses as soon as possible. It makes no sense, however, to charge an express fee for an actual overdraft because overdrafts are covered instantly to pay for a transaction. The transaction is either covered or not with a bona fide overdraft. There is no possibility of a faster or slower schedule.

48.     Unlike actual overdraft services, the amount of an ExtraCash Advance is agreed upon, in writing, between Dave and the consumer before the transaction happens. The amount is not tied to the amount a consumer has sought to pay for groceries, take out of an ATM, or any other debit of a functional account that holds the consumer's money. Instead, like any other loan, the amount of an ExtraCash Advance depends only on Dave offering the amount it thinks a consumer can repay and the consumer has agreed to receive.

49.     Notably, Dave has not always characterized substantively identical ExtraCash Advances as providing overdraft services. Dave previously characterized ExtraCash as a "non-recourse cash advance product" similar to those offered by EWA companies.[12]

50.     In 2022, Dave shifted to characterize ExtraCash as an overdraft protection service after EWA providers began to attract regulatory scrutiny. From 2022 to present, Dave made almost no material changes to how it provides consumers ExtraCash Advances. The only material difference is that, in 2025, Dave stopped charging consumers what it characterized as "tips" and instead charged a mandatory overdraft charge. But the core structure of the transaction has remained the same despite Dave's changes in labels.

51.     Dave has gone to great lengths to reassure consumers that it is not a lender, including by asserting that ExtraCash Advances provide overdraft protection and even charging

---

[12] Dave, Inc. SEC Form S-1 (Feb. 2, 2022) at 14.

an "overdraft fee." These representations have the tendency to mislead a consumer acting reasonably under the circumstances because ExtraCash Advances are, in fact, loans.

**B. ExtraCash Has Added to its Usurious Interest by Manipulating Consumers into Providing Tips and Fees.**

52.    While Dave tells consumers that ExtraCash Advances are interest-free and instantaneous overdrafts, ExtraCash users simply cannot obtain instant payments without substantial fees, which operate as interest.

53.    In advertisements and social media posts, Dave repeatedly represents that ExtraCash Advances have zero interest:



54.    In reality, Dave charges exorbitant interest that exceeds the interest charged by the payday lenders that Dave warns consumers against. Dave tells consumers that an ExtraCash Advance is "not a payday loan or a payday advance, but it is a way to get money when you need it."[13] Payday lenders charge high fees, some of which end up "resulting in a jaw-dropping APR

---

[13]    Dave, *The hidden costs of payday loans*, available at https://web.archive.org/web/20251117231721/https://dave.com/blog/why-you-deserve-better-than-payday-advance-apps (last accessed November 17, 2025).

of about 400%." However, when including ExtraCash fees, Dave's Extra Cash Advances have APRs far in excess of traditional payday loans.

55.     Dave has collected usurious interest from a wide array of deceptively presented fees: (1) "overdraft fees," (2) express fees, (3) membership fees, and (4) tips.

56.     Not all of these fees have been charged consistently, but consumers have faced usurious interest regardless of the exact details of Dave's fee schedule.

57.     In February 2025, Dave announced a new "simplified" fee structure by which it would reduce its express fees and no longer charge tips. This reduction in some fees meant the introduction of new fees and an increase in other fees. In particular, Dave started charging a mandatory "overdraft fee" in February 2025. Then, in August 2025, Dave increased its monthly membership fee from $1 per month to $3 per month. These shifting fees can be summarized in the below sample $25 ExtraCash Advances with ten-day repayment schedules and an external account, one from January 2025 and the other from September 2025:

|  | January 2025 | December 2025 |
|---|---|---|
| Principal | $25 | $25 |
| Express fee | $5 | $0.38 |
| Subscription fee | $1 | $3 |
| "Overdraft fee" | --- | $5 |
| Default Tip | $3.75 | --- |
| Total Fees | $9.75 | $8.38 |
| APR | 1,424% | 1,223% |

      *i.  Starting this Year, Dave Has Mandated "Overdraft Fees" that Are Not for Overdrafts.*

58.     Dave now charges a mandatory "overdraft fee" of $5 or 5% of the principal up to $15 maximum, whichever is higher, for all ExtraCash Advances.

59.    Dave contrasts itself to overdraft services at major banks to assert that consumers are, in fact, getting a good deal with this model:[14]

| | Chase | Wells Fargo | US bank | PNC | Dave |
|---|---|---|---|---|---|
| Overdraft cost to access $100[1] | $34 | $35 | $36 | $36 | $5 |
| Annual bank account maintenance fees[2] | $144 | $120 | $83 | $84 | $0 |
| Minimum balance to avoid account maintenance fees[3] | $1,500 | $500 | $1,500 | $500 | $0 |

60.    Dave omits, however, that the overdraft services these banks provide are entirely different from what ExtraCash Advances provide.

61.    As described more fully above, Dave does not provide a bona fide overdraft service. There is no third party, only Dave and the consumer. There is no functional debit account that has actually been overdrawn. Instead, there is an exchange of money between Dave and the consumer and an agreement for the consumer to pay Dave back. In other words, Dave provides a loan.

62.    Dave thus charges a fee that is wholly disconnected from its stated purpose. "Overdraft fees" are not used to process an overdraft. They are not used for any purpose other than Dave lining its pockets.

63.    Indeed, in a press release announcing this fee for the first time, Dave did not characterize the new fee as an overdraft fee at all. It was just a "simplified 5% fee structure

---

[14]    Dave, Knowledge base, ExtraCash, *ExtraCash transfers*, https://support.dave.com/hc/en-us/articles/34766072608013-What-are-ExtraCash-Fees?__cf_chl_rt_tk=R. HsJ8BQEImg9NHsI.8jVrSKzUhV2Mt2EW1u91fEloo-1763587307-1.0.1.1-KAYMAUFKg7Zjbekbef55c TLNLTrq4nsaGrKPo0Oit4I (last visited Dec. 29, 2025).

including a $5 minimum and $15 cap" to replace its previous fee structure.[15] Since then, the Company has been consistent in characterizing the fee as a fee to process an overdraft.

64.     Consumers are understandably wary of payday loans, which are illegal in Maryland, and excessive overdraft fees, which are a huge cost to consumers. Dave uses misleading language to take advantage of consumers' wariness, falsely contrasting its product with payday loans and mischaracterizing its product as a protection against overdraft fees. By placing its product in sheep's clothing and contrasting itself with big banks who charge huge overdraft fees and unscrupulous payday lenders who charge usurious interest, Dave conceals the true cost and nature of ExtraCash Advances to consumers' detriment. The result is usurious interest from the mandatory "overdraft fee" alone. For example, on its own, before taking into account any other fees, a $25 loan with a $5 "overdraft fee" and a 10-day repayment schedule amounts to a whopping 730% APR.

65.     Worse yet, according to data analyzed by the Center for Responsible Lending, use of the kinds of loans that Dave provides to consumers actually increases the incidence of consumer overdrafts.[16] Users experiencing at least one overdraft rose from 9.7% before their first cash advance loan to 14.1% in the three months after taking out their first loan. For frequent users, they pay more than three times in overdraft fees alone, compared to less-frequent users. In other words, not only is the "overdraft fee" charged by Dave usurious and misleading, the "overdraft fee" does nothing to prevent actual overdrafts and ExtraCash Advances actually increase the frequency of consumers' true overdrafts.

---

[15] Dave, *Dave Completes Transition to Simplified Fee Structure* (Feb. 20, 2025), available at https://investors.dave.com/news-releases/news-release-details/dave-completes-transition-simplified-fee-structure.

[16] Center for Responsible Lending, *Escalating Debt: the Real Impact of Payday Loan Apps Sold as Earned Wage Advances (EWA)* (Sept. 22, 2025), available at https://www.responsiblelending.org/research-publication/escalating-debt-real-impact-payday-loan-apps-sold-earned-wage-advances-ewa.

*ii. Dave Charges Express Fees That Are, In Effect, Mandatory.*

66.     In addition to describing ExtraCash as carrying no interest, Dave has marketed ExtraCash as capable of providing instant cash. Consumers can get $500 "instantly" or in "5 mins":





67.     But in reality, there are two ExtraCash Advance products. Consumers have had the choice between a product with interest and instantaneous payment or a product without interest and payment within two or three days. However, consumers have not had the choice to access the product Dave has advertised: instantaneous payment without interest.

68.     Until early 2025, Dave charged between $3 and $25 for instant ExtraCash Advances. This amount was higher or lower depending on the amount of the ExtraCash Advance and whether the user transferred funds to a Dave-affiliated account or to an external bank account. A transfer to a Dave account cost $3 minimum or 3% of the principal, whichever was higher. A transfer to an external account cost $5 minimum or 5% of the principal, whichever was higher.

69.     On its own, this fee structure imposed massive APRs. A $25 loan with a $5 express fee and a 10-day repayment schedule amounts to 730% APR.

70.     The actual cost to Dave for transferring funds to an external account is, in fact, less than 5 cents for external users, a far cry from the up to $25 express fees that Dave has charged.[17]

71.     This sleight of hand was even more egregious for users with a Dave mobile debit account. For these users, Dave did not bear any transaction costs because these users' accounts are not external. Nonetheless, Dave imposed a purported transaction fee on those users' requests for expedited payments.

72.     Thus, consumers who were told that they could get instant funds with no interest were deceived. They could only get instant funds if they agreed to fees that amounted to usurious interest.

73.     Today, Dave has a modified schedule for express fees. Dave now charges a 1.5% express fee for transfers to external accounts. This fee reduction did not result in lower overall fees for consumers, however, because Dave has now imposed a new "overdraft fee" and higher membership fees.

74.     No matter the amount of the fee or exact time period, these express fees have been deceptively hidden. Dave's only references to express fees are found in block paragraphs with vague language and small text, located far from Dave's prominent representations that consumers can access funds in "under 5 mins." Dave users only find out about these fees late in the process. For consumers to whom Dave advertises—individuals who are desperate for cash and need it under five minutes—a two-to-three day delay is not a real option at that point.

75.     If a consumer does not pay an express fee and needs to use their primary bank account, the consumer cannot access the advertised version of an ExtraCash Advance for its

---

[17]     TheClearingHouse,     RTP     Pricing     (Feb.     7,     2019),     available     at
https://www.theclearinghouse.org/-/media/New/TCH/Documents/Payment-Systems/RTP_-Pricing_02-07-
2019.pdf.

intended, core purpose: an instant source of cash. The consumer would instead access an inferior product, one not promoted by Dave's many advertisements. In other words, the express fee is effectively mandatory if the customer wants to use the product Dave is promoting.

### iii. Dave Requires Membership Fees to Access ExtraCash Advances.

76.     Dave forces users to agree to a membership fee to access ExtraCash Advances. Before August 2025, this fee was $1 per month. Today, this fee is $3 per month.

77.     Dave only allows users to take out an ExtraCash Advance if they enroll in this automatically recurring charge.

78.     Dave's membership fee continues to be charged until a consumer pays off the balance on their ExtraCash Advance, imposing even more exorbitant fees, month after month, for a small-dollar loan.[18]

---

[18]     Dave, Knowledge base, Account management, *Updating your information*, https://support.dave.com/hc/en-us/articles/360002633892-How-do-I-close-my-Dave-membership-and-bank-account-s (last visited Dec. 29, 2025).

*iv. Dave Deceptively Pushed "Tips" on Consumers.*

79.    Until around February 2025, Dave repeatedly prompted users to provide a tip for each ExtraCash Advance, pressuring consumers to provide a "tip" to Dave. Upon accepting an ExtraCash Advance, consumers would see a screen along the lines below:



80.    The large, green button proclaiming "Thank you," combined with the fact that a consumer's "advance is on its way" leads consumers to believe that the tip has already been provided. In fact, a consumer clicking on "Thank you!" would be charged an extra 15% for their ExtraCash Advance. These tips were not mentioned in advertising or in the flow of screens leading consumers to obtain an ExtraCash Advance. As a result of the above screen design leading consumers to believe that tips were already provided and the fact this this screen is the first time consumers learn about tipping, consumers are understandably surprised to learn that they have been charged an extra 15% after clicking "Thank you!"

81.    According to internal records obtained by the Federal Trade Commission and U.S. Department of Justice, Dave has received numerous consumer complaints that Dave "force[s]" or "make[s]" consumers tip. Consumers realize too late and later complain to Dave that this

process is "very deceptive" and "SNEAKY" because "it does not give me the option to not leave a tip." Dave, in fact, knew from customer service data that "[m]embers are still unaware they left a tip when they advance" and that "Didn't want to pay tip" was one of the top sources of consumer dissatisfaction.

82.     Some within the Company suggested "better visibility" about how to avoid this deceptive charge. There was, for example, discussion about a "[n]o tip" option because "[p]eople expect a 'no tip' button." One Dave employee characterized Dave's tipping process as a "dark pattern" criticized by "designers and members." The Company nonetheless kept its misleading process intact.

83.     In addition to being led to believe that tips were mandatory, consumers were led to believe that a default tip would provide a set number of meals to children in need. In the example above, a reasonable consumer would believe that the default tip would pay for "15 Healthy Meals."

84.     In fact, Dave would only donate 10 cents for every single percentage of a given tip. In other words, in the example above, Dave would only donate $1.50, an amount too low to pay for one meal, much less fifteen.

85.     This deception continued if a consumer thought to "leave a custom tip." A sliding scale represented the number of meals that Dave would provide. On one extreme, a 0% tip would result in zero meals, and a consumer would be depriving a child of a meal. If the sliding scale was adjusted to a lower amount but higher than zero, the number of meals would then go down:

 

86.     In reality, the difference in tip amount had no effect on the actual number of meals provided to children in need. It only affected the amount Dave would donate by a matter of cents.

87.     Amping up the pressure, Dave has led consumers to believe that tips are necessary to ensure that ExtraCash Advances continue to exist by stating that a "tip helps us stay in business." Unlike a lot of bartenders, taxi drivers, and waiters who do rely on tips, Dave was never dependent on tips to survive, demonstrated by the fact that the discontinuation of the tipping practice forced by regulatory scrutiny did not cause the Company to go out of business. However, this is what Dave led consumers to believe. Dave repeatedly pressured consumers into providing tips, suggesting that if consumers did not pay tips, Dave would not be able to provide the same services. In other words, consumers were led to believe that a tip was necessary.

**C. Dave Entices Consumers with Illusory Promises of Instant $500 ExtraCash Advances.**

88.    Dave advertises ExtraCash Advances through television advertisements, social media, and online advertisements that consumers can get $500 ExtraCash Advances.

89.    These ads often feature individuals getting approved for a $500 ExtraCash Advance and immediately accessing $500 with the simple click of a button. In a variety of ways, both visually and in text, Dave makes sure that consumers know they can get $500 from Dave:



90.    Continuing the enticement, the first screen a consumer sees when accessing the Dave app features the same promise:



91.    Then, after successfully signing up, a consumer will see the same promise:



92.    After successfully baiting consumers, Dave applies the switch. The vast majority of consumers, in fact, cannot get $500 from Dave, a reality that consumers only become aware of after signing up.

93.    According to data obtained by the Federal Trade Commission and the Department of Justice, Dave does not offer an ExtraCash Advance at all more than 75% of the time. And for

26

new users who receive offers, only **0.009%** received $500 ExtraCash Advances, and only **0.56%** received $250 or more.

94.      In recent months, Dave has begun to at least tell consumers, in tiny print within a large paragraph at the end of its advertisements and social media posts, that "few receive $500." This disclosure is ineffective, and the overall impression a consumer gets is that they can receive $500 in an ExtraCash Advance for several reasons:

   a.  The disclosure is buried in a full paragraph of text.

   b.  The disclosure is usually intended to be viewed on social media, where it is unreadable.

   c.  The disclosure is not present as consumers hear or read the claim it seeks to modify. In other words, consumers hear or read that they can "get up to $500" and are not immediately told that they cannot, in fact, get $500.

95.      It is an unfair and deceptive trade practice to tell consumers that a product is available and then make that product unavailable. The term for this practice—a bait and switch—describes exactly what Dave has done here. Dave leads consumers to believe they can access $500 ExtraCash Advances when, in fact, they cannot.

**D.  Dave Provides ExtraCash Advances Without a License.**

96.      Because Dave provides loans to consumers in Maryland, it must obtain a license pursuant to the Maryland Consumer Loan Law, Md. Code Ann., Com. Law, § 12-301, *et seq*. Dave provides funds and collects repayment from outside the State of Maryland without a license.

**E.  Dave Hooks Users Into a Cycle of Debt.**

97.     Dave's tactics cause a cycle of debt for consumers. As a consumer obtains one ExtraCash Advance after another, a consumer is less able to afford utility bills, rent, and food. As a consumer is less able to pay for utility bills, rent, and food, a consumer needs more ExtraCash Advances, and the cycle starts again.

98.     Consumers who need $25 or $100 at a time are not just living paycheck-to-paycheck. Because of Dave, they are living day-to-day, with each day burdened with more fees.

99.     Data analyzed by the Center for Responsible Lending shows that, for direct-to-consumer cash advance companies (including Dave), "repeat borrowing is the norm, not the exception: nearly three-quarters of users (72%) not only come back for another loan, but do so quickly, taking out more than one loan within a two-week period."[19]

100.    Dave has taken every possible step to fuel this problem and increase the frequency of ExtraCash Advances for each ExtraCash user. In particular, Dave imposes artificial, per-transaction limits to get consumers to come back for more. In the below screen, a consumer sees that they are "approved" for $75 but have to come back for a second transaction to actually receive $75:

---

[19] Center for Responsible Lending, *Escalating Debt: The Real Impact of Payday Loan Apps Sold as Earned Wage Advances (EWA)* (Sept. 22, 2025), available at https://www.responsiblelending.org/research-publication/escalating-debt-real-impact-payday-loan-apps-sold-earned-wage-advances-ewa.



101.    This high-frequency lending leads to more fees being collected for Dave and even higher APRs for consumers. A $75 loan with a $5 "overdraft fee" and $1.13 express fee would amount to a still-usurious 298% APR. But two loans for $40 and $35 each would mean $10 in "overdraft fees" and $1.13 in express fees, resulting in a 541% APR.

102.    Dave also encourages consumers' dependence by encouraging them to check whether they are approved for a new loan every day: "Dave reviews your account and updates your eligibility on a daily basis, so you can check back tomorrow to see your new status."[20]

103.    Dave encourages dependency and higher APRs by forcing artificial, per-transaction limits and encouraging daily loans. The more transactions a consumer has to go through, the more interest Dave collects.

## COUNT I
### *Deceptive Trade Practices*

---

[20]    Dave,    Knowledge    base,    ExtraCash,    *ExtraCash    eligibility*, https://support.dave.com/hc/en-us/articles/34766110141709-ExtraCash-eligibility (last visited Dec. 29, 2025).

104.    The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

105.    The Baltimore Consumer Protection Ordinance, Baltimore City Code Art. 2, § 4 ("CPO"), protects consumers and others against "unfair, abusive, or deceptive trade practices," which are defined in accordance with the definitions contained in the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann, Com. Law, § 13-301. *See* Balt. City Code Art. 2, § 4-1 (13).

106.    Dave is a "person" or "merchant" engaged in the extension of credit and collection of consumer debt in the City of Baltimore. Balt. City Code Art. 2, §§ 4-1(9)-(10), 4-2 (4)-(5).

107.    The MCPA identifies as deceptive trade practices any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" and "[f]ailure to state a material fact if the failure deceives or tends to deceive." Com. Law, § 13-301(1) & (3).

108.    ExtraCash Advances are loans under the Maryland Consumer Lending Law ("MCLL"). Com. Law, § 12-201(e).

109.    In the alternative, even if ExtraCash Advances are not "loans," ExtraCash Advances are a "devise or pretense" by which Dave has collected interest or charges. Com. Law, § 12-303(d)(2).

110.    Maryland law caps interest rates on short-term loans chargeable on ExtraCash Advances at 33%. Com. Law, § 12-206(a)(2)(1).

111.    Loans or advances are void and unenforceable in Maryland when a person contracts for any "interest, charge, discount, or other consideration greater than that authorized under State law." Com. Law, § 12-314(b)(1)(i)(1).

112.    Dave has charged interest in excess of 33%, failed to obtain a license to provide consumer loans to Maryland consumers, and has enforced payment of principal, interest, and charges that are unenforceable under Maryland law. These violations of the MCLL are contrary to the public policy of the State of Maryland.

113.    Dave has violated the CPO by engaging in the following deceptive trade practices:

    a.  Misrepresenting ExtraCash Advances as a non-loan product;

    b.  Failing to represent the material fact that ExtraCash Advances are loans, not overdraft services;

    c.  Failing to represent the material fact that ExtraCash Advances are void and unenforceable under Maryland law;

    d.  Failing to represent the material fact that Dave has engaged in consumer lending activity without a license in violation of Com. Law § 12-302;

    e.  Misrepresenting ExtraCash Advances as providing instant payment with zero interest when, in fact, Dave does not provide such a service to consumers;

    f.  Misrepresenting ExtraCash Advances as charging zero interest;

    g.  Misrepresenting ExtraCash Advances as providing instantaneous access to $500 at a time when, in fact, most consumers cannot access any instantaneous ExtraCash Advances and consumers can almost never access instantaneous $500 ExtraCash Advances;

h.   Misrepresenting the nature of tips as necessary to continue to provide consumers future access to ExtraCash Advances; and

i.   Misrepresenting that Dave pays for or provides a set number of meals to hunger advocacy organizations based on the amount a consumer tips when, in fact, Dave only donates a small percentage of a tip to hunger advocacy organizations.

114.    The above representations and omissions were false, misleading, of the kind which have the capacity, tendency, or effect of deceiving or misleading consumers.

115.    Each misrepresentation and failure to disclose material facts by Dave is a separate violation of the CPO.

116.    Each fee and tip collected by Dave as a result of these unlawful trade practices is a separate violation of the CPO.

117.    Each day in which Dave has operated without a license is a separate violation of the CPO.

118.    While engaging in the unlawful practices described herein, Dave has, at all times, acted willfully. Dave knew or should have known that its actions were of the nature prohibited by the CPO.

119.    As a result of the foregoing, the City seeks all legal and equitable relief as allowed by law, including civil penalties, injunctive relief, restitution, and disgorgement.

### COUNT II
### *Unfair Trade Practices*

120.    The City of Baltimore reasserts, realleges, and incorporates by reference each paragraph above as though fully set forth below.

121.    Courts look "to statutes or other sources of public policy to affirm that a practice is unfair." *Legg v. Castruccio*, 100 Md. App. 748, 769 (1994).

122.    A person cannot make "loans" of $25,000 or less for personal, family, or household purposes in Maryland unless the person has a license under the MCLL, or is otherwise exempt from the MCLL licensing requirement. Com. Law §§ 12-302, 12-303(a).

123.    Dave has violated the CPO by engaging in the following unfair trade practices:

    a.    Engaging in consumer lending activity without a license in violation of Md. Com. Law § 12-302;

    b.    Charging interest and/or charges in excess of the rate allowed by the MCLL;

    c.    Collecting interest and/or charges on loans that were void and unenforceable;

    d.    Encouraging a cycle of debt through manipulation; and

    e.    Engaging in manipulation and scare tactics to force users to provide fees and tips to Dave.

124.    These trade practices are likely to cause consumers substantial injury that is not reasonably avoidable and not outweighed by countervailing benefits.

125.    Dave's actions are against public policy, as expressed through the MCLL.

126.    Each fee and tip collected by Dave as a result of these unlawful trade practices is a separate violation of the CPO.

127.    Each day in which Dave has operated without a license is a separate violation of the CPO.

128.    While engaging in the unlawful practices described herein, Dave has, at all times, acted willfully. Dave knew or should have known that its actions were of the nature prohibited by the CPO.

129.    As a result of the foregoing, the City seeks all legal and equitable relief as allowed by law, including civil penalties, injunctive relief, restitution, and disgorgement.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff City of Baltimore, respectfully requests that the Court enter judgment in its favor and against Dave, as follows:

a. The maximum amount of statutory penalties available under Baltimore City Code Art. 2, § 4-3(a), for each violation of Baltimore's CPO, Baltimore City Code Art. 2, § 4;

b. Injunctive relief mandating that Dave cease the exploitation of Baltimore City consumers by trapping them in a cycle of debt;

c. Injunctive relief ordering that unlawful ExtraCash Advances be deemed void and unenforceable, and that Dave return all principal, fees, and tips to Baltimore consumers;

d. Injunctive relief requiring Dave to reform its practices to accurately describe ExtraCash Advances; and

e. Any other relief as may be available and appropriate under the law or in equity.

## **DEMAND FOR JURY TRIAL**

The City demands a jury trial for all claims upon which a jury trial is available.

Respectfully submitted,

EBONY M. THOMPSON, City Solicitor

Date: December 30, 2025

*/s/ Sara Gross*
Sara Gross, Chief Solicitor (AIS 0412140305)
Thomas Webb, Chief Solicitor
Christopher Sousa, Chief Solicitor
(AIS 2512221015)
Zachary Babo, Assistant Solicitor
(AIS 2211280023)
Natalie Neill, Assistant Solicitor
(AIS 2012180092)
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
410.396.3947
Sara.gross@baltimorecity.gov
Thomas.webb@baltimorecity.gov
Christopher.sousa@baltimorecity.gov
natalie.neill@baltimorecity.gov
Zachary.Babo@baltimorecity.gov

John G. Albanese (PHV forthcoming)
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
jalbanese@bergermontague.com

James Hannaway (PHV Forthcoming)
BERGER MONTAGUE PC
1001 G Street, NW, Suite 400 East
Washington, DC 20001
T. 202.869.4524
jhannaway@bergermontague.com

*Attorneys for Plaintiff Mayor & City Council of Baltimore*